at all. Good morning, your honors. Good morning. John Markham for the appellant, Plaintiff Below, Analia Montani. If I may, your honor, reserve two minutes for rebuttal. You may. Thank you. Your honors, we seek reversal, as you know from the papers, on two grounds. One, that the magistrate determined that without expert testimony on the issue of whether the test was done in which Plaintiff Below was injured, that that had to be determined by expert testimony, expert opinions as to whether the test was below the standard of care, rather than common sense, which is the typical jury province. And the second issue is whether or not they breached the obligation to act in good faith and with fair dealing and non-arbitrarily when they dismissed her some two months after her injury from that test. With respect to the test, our claim is simple. During a test which has been devised by the school, the instructor had told her to hold on to a belt that she had lashed around him for that purpose, to steady him. Hold on to the belt. And then while she was transferring him, holding on to the belt, he, 210 pounds, and heavier than she, and taller than she, abruptly slipped, causing her to, while she was holding the belt, to go down with him and therefore wrench her back. That is her negligence claim. In fact, the record below reflects through her treating physician's testimony, her back still hurt years later. So counselor, the profession that she was studying, there is the expectation that regardless of her weight and regardless of the weight of the patient, there is an expectation that part of the training is to teach them how to assist people in moving. Yes, your honor. That was the purpose of the test. Our contention is that the part of the test, which by the way, he denied he did. He says he's never done it. So there's a factual question as to whether he did it. It's not part of the test. He said he didn't do it. Our contention is when you're doing that test, which requires her to manipulate someone, it is below the reasonable standard of care if you're a bigger person to simply drop your weight down abruptly, causing that kind of a wrenching. That's a matter of common sense. That does not require an expert. And what expert would it be? We're not talking about the test itself, which he says was devised, and he says did not have that as a component because he denied he did it. We're talking not about the test. We're talking about what he did during the test. In my brief I used an analogy, and I don't know if it took, but I'll try it again. Suppose during the test he feigned that he was an epileptic and therefore had a seizure, and that part of that seizure his arms flailed and his hand whacked her in the face and broke her nose. Now, would that take an expert to have a jury determine whether that was below the common standard of ordinary care under means well accepted and garden variety statement that those things are not irrigated from juries to experts. Those are the use of common sense. Are you driving too fast in the circumstances? Are you flailing your arms in the circumstances? Are you all of a sudden dropping down in the circumstances? Suppose she passed and then went out and worked, and first day on the job the patient slips and drops and she hurts her back. Second day on the job someone with epilepsy whacks her in the face. She then sues, claiming her training was inadequate because they never put her through, showed her how to deal with those situations in a test and didn't prepare her for it. Would that require an expert? I would think it would. I think it probably would. Well, it would therefore seem that the converse would apply as well. We would need to know is this the type of thing that to train a person in this profession they should be shown how to do and how to deal with or not? I think, Your Honor, that it becomes a question of fact in the converse. Let me take the example you gave. If there was enough factual data from which the school could have determined, hey, we've got to warn these kids or these students about abrupt falling or flailing arms. But we don't know whether that data exists without an expert. Exactly. Therefore, the fact that they didn't warn her of that may or may not have required an expert depending on whether the data was available. But that's not our case. Our case is not that it happened afterwards that she was unprepared. The factual matter on the converse is a fact matter. Was it negligent for him to simply do this without warning to her and therefore cause injury to her? What expert tells us whether or not that was standard? Is it a belt expert? Is it a thrust expert? Is it a structural engineer? They've said we need an expert, but they haven't offered what kind of expert that would be. We're not talking about the test. We're talking not the test. We're talking about what he did, which he himself says was not something that he did. He's never done it, he says. Therefore, it's not part of the standard test. We don't need a highfalutin expert. The jury can determine whether in these circumstances, if they believe her, which is a factual question. If what he did mimics what patients do in real life, it's just hard for me to understand why you wouldn't need an expert to say that that wasn't appropriate training. Your Honor, we weren't saying that what he did was or was not something that was part of the normal test. He said it wasn't part of the test. He said he didn't do it. And in that circumstance, it's not part of the test. They're not justifying that. Did you argue below that he was your expert? No, we didn't. I guess that's what you're saying to us. I don't think any of us, I certainly have no idea whatsoever as to whether you should train someone by exposing them to a dead drop or not. I don't know. An expert might say you do or don't, so it seems to me you use an expert. It seems your argument here today, though, is that he said you don't, and then he did it. Well, he said he did not. He said it wasn't part of the test. That's a fact matter. He said I didn't do it. I've never done it. But we have to look at the facts in a light most favorable to her. So we have to assume that he did it the way she says he did it. Oh, he, that's right. But he says it wasn't his assertion that he did not do it allows me to argue below, members of the jury, this was not part of the test according to him because he said he didn't even do it. Now, if he said he didn't do it, the jury could reasonably infer factually that it wasn't part of the test. So therefore, you don't get into whether or not that is an appropriate thing to do medically given the data involved and how often that happens. This is a situation where he just abruptly did it and as a matter of fact said he didn't, and that means that we should be allowed to have a jury determine whether as a common sense matter, if you credit her testimony that he did it, that it wasn't part of the test, and that it hurt her, and that it was unreasonable for him to do it in light of the weight disparity. And that's basically our position. And the Sertles case, which the court distinguished below, is simply in our court. The basketball trainer there did not tell the coach that he should lay off this basketball player because of his knees. And the court says very specifically to the extent that the basketball player's claim of negligence against Wheeler, the trainer, involves a failure by the trainer to communicate to Simon the nature and the extent of his knee problems, that is a matter of common negligence that doesn't require an expert. We think ours is just as simple. Again, my time is up. We are not challenging the efficacy of the test as it was supposed to be given. Do you need to establish that the fall by him was intentional? I think it would certainly help. And the test, by the way, the record says that she believes it was on purpose by the way he did it. Right, but her belief isn't really what we're interested in. Is there a basis in this record where the jury could find that he defined the test as A, B, C, and D, and then intentionally added element E, which he has said is not part of the test? That's your best case, right? That's my best case. Is there evidence the jury could find the intentionality on the addition of the added you say unnecessary element? I believe there is because he had control over himself. There was carpet on the floor. And if they credit her that he abruptly dropped, a reasonable juror could draw from that that drop was on purpose. She said that it appeared to her, based upon the way it happened, that it was something he did purposely because there was no slipping. It didn't look like he was slipping. She may be allowed to give a lay opinion to that effect under the lay opinion rule. But even if not, the fact that he dropped precipitously under her description, I believe a rational juror could infer. Does he deny that he dropped? Yes, he did. He denies that he has dropped. He says, I recall every time he dropped, he measured it appropriately. You suggest that we start doing that in a test. Thank you. Thank you. Mr. Caplan, good morning. Thank you. Edward Caplan for the University of New England, and Professor Scott McNeil. As this Court knows, the District Court below ruled know expert testimony was required in order to determine a negligence situation for a student who was conducting what is called a patient transfer simulation test, and that the test was negligently devised was the claim. And let me stop there for a moment, because there's a key difference here in the interpretations. In paragraph 32 of the plaintiff's complaint, they didn't allege that Scott McNeil abruptly dropped outside of all of the parameters of testing. What they said in their complaint was, and I quote, the University of New England is negligent because it knew or should have known that the test was unreasonably dangerous and likely to cause harm. That is a test, that is a question about a test, not about the circumstances surrounding the test. And it was on that set of facts that the magistrate judge and then the district judge issued their summary judgment ruling. The test was, according to them, unreasonable. The second issue... But are they saying the test is designed or the test is implemented? The complaint said that the test was unreasonably dangerous and likely to cause harm. Right, that can be designed. When you told us to look at paragraph 32, I think you used the word designed. As I look at 32, I don't see the word designed in it. I'm sorry, Your Honor. It doesn't specifically state the word designed. So reading it generously, particularly, why can't we read it as saying it was unreasonably dangerous, either as designed or as implemented? Well, Your Honor, I think if you want to read it as generously as you can for the plaintiff, you could. However, it would not change the result in this situation. And why is that? It is because if the test was unreasonably designed, it would require... Put that to one side, take the other one. If the test was unreasonably implemented, it would require an expert, in our view, and I believe in the district court's view, to come forward and testify as to why the actions of Professor McNeil... Fair point. What if it was intentionally implemented? You're teaching a kid how to drive a car and you take him out and then on the last half mile, you say... Hit the trick. You hit the trick, okay? As long as the driving instructor admitted that that wasn't part of the usual test, I'm thinking we would not need an expert in that case. Well, Your Honor... And that's what they're trying to describe. As I heard the argument we just heard here, what they're saying is, this is exactly that, that your guy has said the test does not include this drop away, and they're saying, that's right, it doesn't, so we don't need an expert, but he did it intentionally anyhow, like driving into the tree. So the record evidence in the case does not substantiate the view that Professor McNeil intentionally took any action. The record evidence in the case, and this is an important distinction that I'd like to get to and will, is that he had no recollection of doing this, that he had no recollection of carrying out this act, and there is no evidence in the record to demonstrate otherwise. Well, she says it happened. That's evidence. I'm sorry, Your Honor. I'm just saying, that's evidence. The situation before the court, and well, let me address that issue in a different way, because there are actually, there are several factors that were alleged to be facts in this The court found them to be significant factors, and I think it's worthwhile taking a look at them. There were three in total. The first of those factors was, allegedly, that the plaintiff was a slight woman. There was no record evidence to differentiate between the plaintiff's size and Professor McNeil's size, and that was significant to the district court. Secondly, that Dr. McNeil told Ms. Montagne to hold him up by holding firmly to the transfer gate belt. There is absolutely no evidence in this case that Professor McNeil took any such steps. The evidence is that Professor McNeil was conducting a test, a simulated test, in which one of the things that Ms. Montagne needed to do was apply a gate belt. She was trained before the test as to how to apply a gate belt. She was not instructed at the time of the test in any specifics concerning the use of that gate belt, and the district court found that significant. The third fact, and perhaps the most important one, is that the plaintiff was allegedly instructed to hold onto the belt while Dr. McNeil dropped all of his weight on the plaintiff. There is no evidence in the record to substantiate that fact. The district court found those three factual allegations troubling, and found that without those factual allegations, the summary judgment would be granted and should be granted because there was no contrary evidence to dispute the situation. I also want to take one second. I'm sorry, are you saying that the plaintiff didn't offer through her testimony contrary evidence? I don't believe that there's testimony in the plaintiff's record that Dr. McNeil intentionally dropped his weight on her. If that answers your question. Well, how did she put it? Did she just say he dropped? She described different scenarios when she was allegedly subjected to his weight. She never suggested that he told her to hold onto the belt. She never suggested that he told her or instructed her to do so while he was dropping his weight. She did say that he dropped his weight during the course of the test. That much she said. And I need to take a second and apologize to the court for a reference in our brief that was a miscite. And I want to correct that reference if I might. On page 31 of our brief, we cited to the plaintiff's deposition testimony. That deposition testimony was in connection with the plaintiff's being cited the appendix at 8182. In fact, the plaintiff's deposition at page 8182 was what that site related to. It should have been a site to the record at page 56 and 57. It's the same proposition. In fact, what we cited that for was to confirm the fact that the plaintiff never received anything from the university concerning this October 27 event and student development committee that she relies upon and that the magistrate and district court rejected because it hadn't been raised until the summary judgment proceedings. But I did want to make sure that I at least clarified that for the record. If I can move on to another matter for a moment. The student handbook issue in this case is an issue that gave rise to the allegations of a need for either good faith and fair dealing. I'm not sure exactly how it was characterized or arbitrary and capricious because it was sort of a moving target as we went forward. And it's interesting to note that in this case, there was no complaint about any specific provision of the student handbook, which was allegedly breached, which was allegedly violated. There was a general reference to the fact that there was a student handbook, but nothing any more specific than that. In this regard, it's important to keep in mind the Millen versus Colby College case that's cited in our materials and actually cited in the materials of the appellant as well. In that case, the extent, to the extent a party's expectations are controlled by that handbook, that is going to, that is going to resolve an issue with regard to whether or not it creates any specific contractual relationships. In the UNE handbook, at appendix page 369 and 370, we specifically state that the handbook is not a contract, either express or imply. We specifically reserve the right to unilaterally modify the contract in any way that we choose to during the course of the student's relationship with the university. And in that situation, respectfully, the Millen court would conclude that there is no contractual commitment. I mentioned earlier the situation regarding the October 27 alleged contractual commitment. The district court found, first of all, that it didn't give rise to any particular obligation on the part of the university, that it was not a promise to do anything. But more importantly, the district court decided that it had never been raised in any of the complaints and could not simply be raised as a basis for a contractual argument at the summary judgment stage. And so the court rejected that particular argument in this case and would not allow that to come in for reliance in terms of the, in terms of either the good faith and fair dealing issue or in terms of the arbitrary and capricious language. I just want to, I would like to close by simply noting that in this particular case, the Seals case has been mentioned several times. There is a very significant distinction between the Seals case in Maine and this case. And the distinction is that in Seals, the individuals involved were specifically aware of the condition of the ball player at issue. And they were specifically aware that allowing him to play would cause him further damage. And therefore, there was no need for an expert to come forward and explain that situation. The distinction here, of course, is that there was no particular knowledge on anybody's part that any element of this test was going to cause harm and was going to damage anybody. Thank you, Your Honor. Thank you. Thank you, Your Honor. Let me start with record references. These are in the deposition transcripts that are part of the appendix. A-78, he is taller than me. A-77, he slipped on purpose. A-77, my back hurt immediately. A-77, he faked slipping while I was holding on. With respect to her holding on, A-77, question, where were your hands? They were holding on to the gate belt. A-78, holding on to the gate belt. A-122, his deposition, she put the gate belt on. It gives them something to hold on to. That's his quote. She was told to hold on to the belt and she was. The magistrate leapfrogged over the service case, which held that no expert was needed for a trainer to be determined to be judged about the reasonable standard of care in connection with telling the coach that nobody shouldn't play. Went down to Connecticut, reached over Massachusetts, and found a case involving Yale Medical School, where the question was whether or not they had instructed the student properly as to how to insert a needle into a catheter into a vein and then pull out the needle and then put the needle back in if the catheter didn't take the right way, all in connection with what we knew about the HIV virus, because the patient had HIV, back in 1988. And the court said, for these questions, that is, quote, beyond the kin of the average juror. What we have here is not beyond the kin, and this court should not irrigate that up to the rarefied notion of experts. Maine has forever been a state that defers to the common sense of the jury and rightly so, and this is one of those cases. With respect, very briefly, to the contract claim, there is the Millian case that we cited in our brief. The law court of Maine has recognized that there is a duty of reasonableness and non-arbitrariness and to meet the student's reasonable expectations for fair treatment. The plan that she met after they told her what it was. That plan is not the contract.